IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 22, 2025

**STATE OF TENNESSEE v. KRISTOPHER PAPPAS**

**Appeal from the Circuit Court for Fayette County**
**No. 23-CR-133     J. Weber McCraw, Judge**
_____

**No. W2024-01232-CCA-R3-CD**
_____

The Defendant, Kristopher Pappas, was convicted after trial by jury of aggravated assault by causing serious bodily injury, as a lesser-included offense of attempted second degree murder, and reckless endangerment with a deadly weapon. The trial court denied his request for judicial diversion and entered judgments for a total effective sentence of five years' incarceration in the Tennessee Department of Correction. On appeal, the Defendant claims that the evidence was insufficient to support his convictions because he acted in self-defense and that the trial court erred in denying judicial diversion. We ordered supplemental briefing to address whether the trial court erred by instructing the jury that aggravated assault is a lesser-included offense of attempted second degree murder. Following our review, we reverse the Defendant's conviction for aggravated assault and remand for a new trial on the lesser included offense of attempted voluntary manslaughter for that count. We affirm the judgment of conviction for reckless endangerment with a deadly weapon and the denial of judicial diversion as to the remaining count.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed in Part and Reversed in Part;**
**Case Remanded**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Bryan R. Huffman (on appeal and at trial) and Jere Mason (at trial), Covington, Tennessee, for the appellant, Kristopher Pappas.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Mark Davidson, District Attorney General; and W. Erik Haas and Falen Chandler, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.    FACTUAL AND PROCEDURAL HISTORY

The Defendant was indicted by a Fayette County Grand Jury with the offenses of attempted second degree murder, employing a firearm during the commission of a dangerous felony, and felony reckless endangerment. This matter proceeded to trial by jury beginning on April 10, 2024.

### A.  STATE'S PROOF

The victim, Willie Tucker, testified that he and his girlfriend, Laycee King, took their children, K.K.[1], R.K., and C.T., and drove their car to a Subway restaurant in Oakland, Tennessee, on March 3, 2023. Mr. Tucker and K.K. entered the restaurant to pick up the sandwiches they had ordered online. While waiting, Mr. Tucker spoke with his mother on the phone and walked outside to the parking lot. He testified that he saw the Defendant sitting in a car parked next to their vehicle. He stated that the Defendant was "cursing" at Ms. King, who was seated in the driver's seat of their car. Mr. Tucker asked why he was "cussing at [his] wife," and the Defendant told him to mind his own business. Mr. Tucker replied that "they [were] his business" and asked the Defendant to get out of his car and "explain why [he was] cussing at [his] family."

Mr. Tucker testified that the Defendant stepped out of his car, pulled a gun, and shot him from ten to fifteen feet away. Mr. Tucker then tried to subdue the Defendant by "rush[ing] him and knock[ing] him to the ground." Mr. Tucker said that he only touched the Defendant after he had been shot twice in the leg and once in the head, that he was speaking calmly, and that he never threatened the Defendant. The Defendant and Mr. Tucker got up. Mr. Tucker leaned against a column in front of the Subway, and the Defendant left the scene. An ambulance later arrived, and Mr. Tucker received medical treatment at the scene, was transported to the hospital, and eventually underwent surgery for a gunshot wound to his head. He testified that his surgery required the removal of part of his skull for six months. He acknowledged that he had trouble remembering the incident due to his head injury and the passage of time.

Laycee King testified that her daughter, K.K., went into Subway to check on the sandwiches while Mr. Tucker was on the phone with his mother. At some point, K.K. came back to the car and told Ms. King that a girl from school who "almost got her in trouble" was working at Subway. Ms. King told her to go back inside and pick up the

---

[1] It is the policy of this court to refer to minor children by their initials to protect their privacy.

sandwiches when the Defendant started "cussing" at K.K. Ms. King recalled that the Defendant was seated in the passenger seat of a car parked beside their car. She did not know the Defendant. The Defendant and Ms. King began arguing.

Ms. King testified that Mr. Tucker walked out of the Subway, approached the cars, and asked, "What's going on out here?" The Defendant told Mr. Tucker to mind his own business, to which Mr. Tucker responded, "This is my f****** business." Ms. King recalled that Mr. Tucker then invited the Defendant to "step out of the car" to "have a conversation like two grown men." Mr. Tucker tossed his phone in their car and walked to the back of the parked cars.

Ms. King stated she got out of her car and called 911 because she did not know what the Defendant and Mr. Tucker were going to do. She recalled that moments later, the Defendant stepped out of his car and pointed a gun at Mr. Tucker. When Mr. Tucker saw the Defendant pointing a gun at him, he "threw his hands up" and said, "[W]hoa." The Defendant then began shooting at Mr. Tucker. After being shot, Mr. Tucker ran toward the Defendant and tackled him, causing the gun to fall out of the Defendant's hand. Ms. King observed a woman, whom she identified as the Defendant's wife, exit the Subway and say to the Defendant, "What the f*** did you just do?" Ms. Pappas then picked up the gun and said, "Get up. We have to get the f*** out of here." The Defendant and his wife then left in the Defendant's car.

Ms. King testified that Mr. Tucker never hit the Defendant before being shot, but she acknowledged that they yelled at each other. She also stated that Mr. Tucker was not close enough to the Defendant to be able to hit the Defendant before the Defendant began shooting at him. She said that neither she nor Mr. Tucker was armed and that they did not threaten the Defendant.

Jewel Tucker testified that she was Mr. Tucker's mother. She said that Mr. Tucker called her on March 3, 2023. While they were speaking, she heard what she believed to be the bell on the Subway door, then Mr. Tucker said, "[W]hoa, whoa, whoa." She said she then heard, "pow, pow, pow, pow, pow, pow, pow," and believed it was C.T. screaming, "Daddy, Daddy." The call ended shortly thereafter.

Amber Rodriquez testified that she worked as a medical assistant. She stated that she went to the Subway in Oakland on the evening of March 3, 2023, to order dinner for herself and her family. While inside the restaurant, she observed a man in the passenger seat of a car and a woman in the driver's seat of another car "yelling" at one another. At some point, a man came into the restaurant and said to Mr. Tucker, "You need to get out here right now." Mr. Tucker went outside, and Ms. Rodriquez heard someone say, "Well, why don't you get out of the car then." She heard gunshots and everyone inside the

- 3 -

restaurant "hit the floor." Shortly afterwards, a young girl, later identified as the Defendant's daughter, came into the restaurant and collapsed on the floor. Ms. Rodriquez attempted to persuade the girl to accompany her to hide in the back of the restaurant because she did not "know where the shooter [was]." The girl then said, "[M]y dad shot him, he's gone." Ms. Rodriquez followed the girl outside, where Mr. Tucker was lying on the ground, surrounded by "a lot of blood" and holding one hand to his head and the other to his side. Ms. Rodriquez administered first aid to Mr. Tucker until the ambulance arrived.

Keith Judkins testified that while he was working at Kisu's Karate, located in the same shopping center as the Subway restaurant on March 3, 2023, he heard two men arguing in the parking lot. Mr. Judkins went to investigate and observed one man in gray clothing approach the other, with his hands up, as if he "was about to fight." He then saw the other man, who stood between two vehicles, raise a gun toward the man wearing gray. Mr. Judkins recalled hearing three or four gunshots soon afterwards. He averred that the two men were not within "arm's reach" of one another when he heard gunshots.

Several officers from the Oakland Police Department ("OPD") testified regarding their investigation into the March 3, 2023 shooting. Officers Allan Craig and Donnie Spurlock arrived at the Subway restaurant soon after the shooting. They secured the area and interviewed several witnesses, including the Defendant's daughter and Ms. Rodriquez. The Defendant was not at the scene; however, he arrived later with his wife. The officers searched the Defendant's car and found a Glock 19 nine-millimeter pistol with an extended magazine as well as nineteen live nine-millimeter Win Luger rounds. Officer Roy Robinson collected evidence in the parking lot, including five nine-millimeter Win Luger casings.

Shannon Springfield, a forensic interviewer for the Exchange Club Carl Perkins Center for the Prevention of Child Abuse, testified that she interviewed both K.K. and R.K. on March 16, 2023. The recorded interviews were introduced as exhibits and played for the jury.

In her interview, K.K. told Ms. Springfield that she went to the Subway restaurant with her family. She and Mr. Tucker entered the restaurant to pick up sandwiches. K.K. went back to their car and told her mother that a girl at the restaurant "got [K.K.] in trouble" at school for something she did not do. She said her mother told her to go back into the restaurant and pick up their sandwiches. At that point, the Defendant, who was in the car parked next to their car, started "cussing [K.K.] out like a dog." Ms. King told him not to speak to her daughter in that way. The Defendant said his wife was in the restaurant and that they did not "want to mess with her," "she's a bad [motherf*****]." The Defendant then picked up a "large gun" and waved it around. K.K. went back into the restaurant and told Mr. Tucker that he needed to go outside because a man was acting crazy. Mr. Tucker

went outside, and she heard him ask, "Hey, what's going on?" The Defendant replied, "You need to mind your own business." Mr. Tucker said something in response, and the Defendant pointed a gun at Mr. Tucker. Mr. Tucker then backed away. The Defendant stepped out of his car and started shooting "before his two feet hit the ground." K.K. and Ms. Pappas ran out of the Subway. K.K. said she saw the Defendant and the gun lying on the ground. She averred that the Defendant either tripped, fell, or lost his balance. Ms. Pappas picked up the gun and said, "We need to go." K.K. saw Mr. Tucker holding his head with blood running down his face and on the back of his leg.

In her interview, R.K. stated that she was in the back seat of their parked car at the Subway when K.K. returned and said the girl in the restaurant had been mean to her. The Defendant said, "So, you're talking about my f****** daughter now." Ms. King told the Defendant not to speak to her daughter in that way. Ms. King and the Defendant asked each other their names, and Ms. King said, "I will get her dad up here if you want me to." R.K. described her biological father as a big man who had been to jail "a bunch of times" for "taking up for his kids." R.K. recalled that the Defendant then pointed the gun at K.K. Mr. Tucker came outside and asked what was going on. The Defendant said, "Mind your own business." Mr. Tucker then said, "Let's take this conversation out [of] the car." R.K. stated that the Defendant fired the first bullet out of his car window and that Ms. King had already called the police at that point. The Defendant "jumped out" of the car and "start[ed] shooting everywhere." After Mr. Tucker was shot in the head, he tackled the Defendant. They both stood up, and the Defendant ran to the other side of the parking lot. The Defendant "let off one more bullet," and his daughter and wife came outside to the parking lot shortly afterwards. His wife picked up the gun and said, "We've got to go." R.K. stated that the Defendant and his wife left their daughter at the Subway.

OPD Sergeant Russell Tankersley and Lieutenant Kevin Perry testified that they interviewed the Defendant at the police station on March 3, 2023. Sergeant Tankersley stated he did not observe any injuries on the Defendant. The recorded interview was played for the jury. In his interview, the Defendant stated that his daughter worked at the Subway restaurant and that he and his wife were there to pick up sandwiches. His wife went into the restaurant while he sat in the passenger seat of their car. While waiting for his wife to return, the Defendant saw a girl exit the restaurant and talk to the woman in the car parked next to him. He overheard them talking about his daughter and said to them, "It wouldn't be wise to go in there fooling with my daughter." He stated that he and the woman began cursing and arguing.

At some point during the argument, Mr. Tucker exited the restaurant and "started talking s***." The Defendant said, "I told that man ten times, 'don't f*** with me. Leave me alone.'" He stated that Mr. Tucker took items out of his pocket and told the Defendant that he was going to "beat [him] out." The Defendant got out of his car, wearing a holstered

gun on his hip. The Defendant again told Mr. Tucker to leave him alone. He said Mr. Tucker took five steps toward him and began to strike him with his fists. In response, the Defendant drew his gun and began to strike Mr. Tucker with it. He said the gun fired several times while he was striking Mr. Tucker, but he was unaware that Mr. Tucker had been shot. The Defendant said that Mr. Tucker fell to the ground, and he hit Mr. Tucker again with the gun. He then threw the gun on the ground.

The Defendant said his wife exited the restaurant after his fight with Mr. Tucker and was very upset. She grabbed the gun and said that she and the Defendant needed to leave. He told her he had done nothing wrong, but she was "freaking out." They left the scene in their car. The Defendant stated he had his wife drop him off on Stevens Road because he knew the police would be waiting for him at his house. After calling a friend to pick him up, he thought about what had happened and called his wife to pick him up. The Defendant and his wife then returned to the Subway restaurant.

The Defendant told the officers he acted in self-defense. He said he was weak because he was "fresh out of rehab." He stated he did not know Mr. Tucker or any of his family members. He described Mr. Tucker as being several inches taller than he was. He admitted that the gun fired, but stated that he did not mean to shoot Mr. Tucker. Sergeant Tankersley asked the Defendant if he had ever heard the saying, "Sticks and stones may break my bones, but words will never hurt me." The Defendant replied, "Yes, sir. But man, I can't do that right now."

The State rested.

## B. DEFENSE PROOF

The Defendant called Terry Woods, who testified that as he walked by a liquor store in the same shopping center as Subway, he saw a man "beating" on the driver's side door of someone's car. The man forcibly opened the car door and began "whooping" and "jumping on" the occupant of the vehicle. The occupant then exited the car and started shooting. Mr. Woods testified that he fled the parking lot after the occupant began shooting.

Amy Pappas testified that she was the Defendant's wife and that she and the Defendant went to the Subway in Oakland on March 3, 2023. She entered the restaurant to pick up a sandwich for the Defendant while he and their minor son remained in the car. She observed some individuals coming in and out of the restaurant before she heard gunshots in the parking lot. She ran outside and saw the Defendant and another man on the ground. The Defendant stood up and tossed the gun aside. Ms. Pappas stated she immediately told the Defendant to "get in the car"; the Defendant did so, and Ms. Pappas

retrieved the gun and tossed it inside the car. As Ms. Pappas drove away from the Subway, the Defendant informed her that he had acted in self-defense and instructed her to return to the Subway. However, Ms. Pappas testified that the Defendant then asked her to drop him off at a neighbor's house, which she did before she and her son returned to their home. She estimated that approximately an hour after she dropped the Defendant off, she retrieved him from the neighbor's house and drove him back to the Subway, explaining that she had been contacted by law enforcement to return to the crime scene. Ms. Pappas recalled seeing some bruising on the Defendant a couple of days after the incident.

Timothy Perry testified that he was in his car in the parking lot near the Subway on March 3, 2023, when he observed a man in a black hoodie "moving strange[ly,] . . . talking to himself[,] . . . [and] cussing." He suspected that the man might be on drugs or mentally ill because he acted with "aggression, more like an outrage." He then heard three or four gunshots and ducked down in his car. When he looked back up, he saw the man in the black hoodie walk backwards and fall. He could also tell that the other person was acting "like something was wrong." Mr. Perry then drove off.

The Defendant rested. Upon this proof, the jury found the Defendant guilty of aggravated assault by causing serious bodily injury, as a charged lesser-included offense of attempted second degree murder, and of felony reckless endangerment. The jury acquitted the Defendant of employing a firearm during the commission of a dangerous felony. The trial court held a sentencing hearing on April 22, 2024.

## C. Sentencing Hearing

At the sentencing hearing, the trial court reviewed the Defendant's presentence report and the Defendant's application to the Tennessee Bureau of Investigation ("TBI") for a certification of his eligibility for judicial diversion. The TBI certificate indicated that the Defendant had no disqualifying convictions.

Investigator Matthew Salamon of the Fayette County Sheriff's Office testified that violent crime "was on the rise" in Fayette County based upon his review of relevant statistics.

Ms. King testified and submitted victim impact statements on behalf of her family. She indicated that the incident had a significant impact on their family, both emotionally and financially. Ms. King testified that Mr. Tucker sustained a serious brain injury, suffered persistent diminished motor skills in his left arm and hand, and experienced hearing loss in his left ear since the shooting. She also stated that since the shooting, Mr. Tucker had received both inpatient and outpatient treatment for depression, anxiety, and post-traumatic stress disorder, and that he was unable to work.

Ms. Pappas testified for the defense that the Defendant and his family had suffered financially, emotionally, physically, and mentally since the March 3, 2023 shooting. She asked that the trial court consider these hardships in fashioning the Defendant's sentence. Finally, the Defendant offered an allocution. He expressed remorse for what happened and stated that his family needed him to support them.

The trial court found, and the parties agreed, that the Defendant was a Range I, standard offender. The parties also agreed that the applicable sentencing range for the Defendant's conviction of aggravated assault by causing serious bodily injury was between three and six years with a 100% service rate, while the applicable sentencing range for his conviction of felony reckless endangerment was between one and two years at a 30% service rate.

The trial court then questioned the Defendant regarding his eligibility for judicial diversion. The Defendant testified that he had never been convicted of a felony or a Class A misdemeanor, nor had he been previously granted any diverted sentence. The trial court determined the Defendant was eligible for judicial diversion. The State argued that judicial diversion was inappropriate, contending that the circumstances of the offense and the deterrence value to the Defendant and others weighed against granting it. The Defendant responded that the Defendant remained a strong candidate for judicial diversion.

Following arguments, the trial court denied the Defendant's request for judicial diversion. In support of this conclusion, the trial court found that while the Defendant had no previous criminal history, it was "concerned about his amenability to correction," noting that the presentence report indicated the Defendant reported that he "uses marijuana and another substance daily." The trial court also found that the circumstances of the offense were "horrible." Citing Investigator Salaman's testimony regarding the prevalence of violent crime in the community, the trial court further found that the value of deterring others from committing similar offenses was high and that granting judicial diversion would not "serve justice." The trial court also found two applicable enhancement factors: that the Defendant employed a firearm during the commission of the offense and had no hesitation about committing an offense when the risk to human life was high, see Tenn. Code Ann. § 40-35-114 (9), (10), and one applicable mitigating factor: that the Defendant assisted authorities in locating or recovering property, see Tenn. Code Ann. § 40-35-113 (10).

After considering the evidence adduced at trial and at the sentencing hearing, the presentence report, arguments regarding alternative sentencing, the nature and characteristics of the criminal conduct, the applicable enhancement and mitigating factors, the statistical information provided by the Administrative Office of the Courts regarding

sentencing for similar offenses, and the Defendant's allocution, the trial court imposed a sentence of five years' incarceration for the Defendant's conviction of aggravated assault and two years' incarceration for his conviction of felony reckless endangerment. The trial court aligned the sentences concurrently, yielding an effective sentence of five years' incarceration. The Defendant filed a timely, but unsuccessful, motion for a new trial. This timely appeal followed.

## II. ANALYSIS

On appeal, the Defendant claims that the evidence was insufficient to support the convictions because he acted in self-defense and that the trial court erred in denying judicial diversion. The State argues that the evidence is sufficient to support each conviction and that the trial court properly denied the Defendant's request for judicial diversion.

In our consideration of these arguments, we perceived a related but unbriefed issue regarding the trial court's inclusion of aggravated assault by causing serious bodily injury as a lesser-included offense of attempted second degree murder in its final charge to the jury. Appellate courts generally have jurisdiction to consider only those issues that are properly preserved and presented for appellate review pursuant to the party-presentation principle. *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022) (citing Tenn. R. App. P. 13(b)). Nevertheless, this court may consider an unpresented or unpreserved issue in order to prevent needless litigation, injury to the interests of the public, and prejudice to the judicial process, Tenn. R. App. P. 13(b), and must "grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires," Tenn. R. App. P. 36(a). This discretion is to be exercised sparingly and only in those cases where consideration of an unpresented or unpreserved issue is necessary "to achieve fairness and justice." *In re Kaliyah S.*, 455 S.W.3d 533, 540 (Tenn. 2015). When this court considers an unpresented or unpreserved issue, it must give the parties to the appeal "fair notice and an opportunity to be heard on the dispositive issues." *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018); *see also Bristol*, 654 S.W.3d at 927-28 ("At a minimum, an appellate court must give the parties notice of the specific issue it intends to address and sufficient time to review the record, conduct research, and prepare an argument *before* the court rules on the issue.") (emphasis in original). This requirement is generally satisfied through supplemental briefing. *Bristol*, 654 S.W.3d at 928. Accordingly, we ordered the parties to prepare supplemental briefs to address whether the trial court erred by instructing the jury to consider aggravated assault as a lesser-included offense of attempted second degree murder in its final charge to the jury and, if so, whether the Defendant is entitled to plain error relief. Because resolution of this claim in the Defendant's favor could result in vacating the Defendant's conviction of aggravated assault, we consider it first.

### A. LESSER-INCLUDED OFFENSES

In his supplemental brief, the Defendant claims that the trial court erred in instructing the jury to consider aggravated assault as a lesser-included offense of attempted second degree murder. He asserts that he is entitled to plain error review of this issue and that the appropriate remedy for the error is to reverse and vacate his conviction of aggravated assault, dismiss the underlying charge of attempted second degree murder, and remand for a new trial on the appropriate lesser-included offenses. The State responds that the Defendant is unable to demonstrate he is entitled to plain error relief. The State alternatively concedes that if this court finds that the Defendant has established the prerequisites for plain error review, then he is entitled to relief, and it agrees with the Defendant as to the appropriate remedy.

A defendant may only receive relief under plain error review if he or she proves all five of the following prerequisites:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

*State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If a defendant fails to prove any one of the five plain error factors, then he or she is not entitled to plain error relief, and the appellate court is not required to analyze the remaining factors. *State v. Bledsoe*, 226 S.W.3d 349, 358 (Tenn. 2007). To qualify as plain error, "[t]he magnitude of the error must have been so significant that it probably changed the outcome of the trial." *Id*. at 354 (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (internal quotation marks omitted)).

### 1. The Record in the Trial Court

The State contends that the record does not clearly establish what occurred in the trial court. We disagree. The written jury instructions were contained in the technical record. They included the following instruction:

> The lesser-included offenses for Count 1, Attempted Second Degree Murder, are as follows and you should consider each in the order presented.
>
> - Aggravated Assault
> - Attempted Voluntary Manslaughter
> - Reckless Endangerment

- 10 -

• Assault

To facilitate our review of this issue, this court ordered the Defendant to supplement the record in this matter with any pleadings or transcripts related to the jury instructions or lesser-included offenses charged in this case. *See* Tenn. R. App. P. 24(e). In response, the Defendant filed a transcript of the trial court's oral instructions to the jury. The trial court instructed the jury:

> The lesser[-]included offense for Count One, which Count One is the attempted second degree murder, are as follows and you consider the lesser[-]included offenses in the order which are presented, and that order is aggravated assault, attempted voluntary manslaughter, reckless endangerment, or assault.

It is clear from both the technical record and the supplemental record that the trial court instructed the jury to consider aggravated assault as the first lesser-included offense of attempted second degree murder. Further, as evidenced by its verdict, the jury clearly considered aggravated assault as a lesser-included offense of attempted second degree murder. We acknowledge that it is the appellant's duty to clearly establish what occurred in the trial court. *Rimmer*, 623 S.W.3d at 255-56. We find that he has done so.

## 2. Breach of a Clear and Unequivocal Rule of Law

We next consider whether there was a breach of a clear and unequivocal rule of law. *Id*. A trial court has an obligation to instruct the jury on all lesser-included offenses that are sufficiently supported by the facts introduced during the trial. *State v. Langford*, 994 S.W.2d 126, 128 (Tenn.1999). The Tennessee Supreme Court has specifically held that reckless aggravated assault is not a lesser-included offense of attempted second degree murder. *State v. Rush*, 50 S.W.3d 424, 431 (Tenn. 2001) (relying upon the test established in *State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999)); *see also State v. Smith*, No. W2013-01735-CCA-R3-CD, 2014 WL 3744637, at *5 (Tenn. Crim. App. July 28, 2014), *no perm. app. filed*; *State v. Saavedra*, No. M2004-02889-CCA-R3-CD, 2006 WL 618299, at *28 (Tenn. Crim. App. Mar. 13, 2006), *perm. app. denied* (Tenn. Aug. 21, 2006). Tennessee Code Annotated 39-11-301(a)(2) states in part, "[w]hen recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." Therefore, the same reasoning under *Rush* applies to intentional or knowing aggravated assault.

In *State v. Burns*, the Tennessee Supreme Court established a three-part test for determining whether an offense qualifies as a lesser-included offense. *Burns*, 6 S.W.3d at

466-67.  As relevant here, an offense is a lesser-included offense under the first two parts of the *Burns* test if:[2]

> (a) all its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> > (2) a less serious harm or risk of harm to the same person, property or public interest[.]

*Id*.  This requires us to consider the elements of both the charged offense of attempted second degree murder and the charged lesser-included offense of aggravated assault.

The elements necessary to constitute criminal attempt are defined in Tennessee Code Annotated section 39-12-101.  We need not explore them here.  To make our lesser-included determination, we must examine the elements of the predicate offense being attempted.  The elements necessary to constitute second degree murder are that the defendant committed a knowing killing of the victim.  Tenn. Code Ann. § 39-13-210 (2018).  The elements of aggravated assault require that the defendant intentionally or knowingly caused bodily injury to the victim, and that the assault resulted in serious bodily injury to the victim - as charged by the trial court in this case - or involved the use or display of a deadly weapon.  Tenn. Code Ann. § 39-13-102 (Supp. 2022).  From this, we see that aggravated assault contains an additional element not present in second degree murder, to wit: either the Defendant caused serious bodily injury or used a deadly weapon.  Therefore, aggravated assault is not a lesser-included offense of second degree murder under part (a) of the *Burns* test.

Likewise, aggravated assault fails as a lesser-included offense under part (b).  Aggravated assault does not require a different mental state than second degree murder.  They both require knowing behavior.  Nor does aggravated assault require a less serious harm or risk of harm.  Here, the trial court instructed the jury on aggravated assault by causing serious bodily injury.  However, the greater offense of attempted second degree murder may be committed without any injury at all.  *See State v. Rush*, 50 S.W.3d 424, 431 (Tenn. 2001).  Thus, aggravated assault by causing serious bodily injury to the victim does

---

[2] Part (c) of the *Burns* test establishes that facilitation, attempt, and solicitation are lesser-included offenses of the predicate offense.  This portion of the test is not relevant here.

not contemplate a less serious harm than attempted second degree murder.[3]  Based upon *Rush* and this court's analysis, we find that including aggravated assault as a lesser-included offense in Count 1 was a breach of a clear and unequivocal rule of law.

### 3.  Substantial Right of the Accused

The next prerequisite of plain error review is whether a substantial right of the accused was violated.  *Rimmer*, 623 S.W.3d at 255.  Both the Constitution of the United States and the Constitution of Tennessee protect a criminal defendant's right to be informed of the nature of the charges against him or her.  *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall . . . be informed of the nature and cause of the accusation[.]"); Tenn. Const. art. I, § 9 (providing "[t]hat in all criminal prosecutions, the accused hath the right . . . to demand the nature and cause of the accusation against him[.]"); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).  "Consequently, the accused may be convicted only of an offense enumerated in the indictment, or an offense that qualifies as a lesser-included offense thereof."  *State v. Moore*, 77 S.W.3d 132, 134 (Tenn. 2002) (first citing *Hagner v. U.S.*, 285 U.S. 427, 431 (1932); and then citing *Rush*, 50 S.W.3d at 427-28).  In corollary, a defendant would not have proper constitutional notice to defend against an offense that is not a lesser-included offense of the indicted charge.  The inclusion of aggravated assault as a lesser-included offense violated the Defendant's constitutional right to notice of the charge against him.  *See State v. Shirley*, No. E2002-03096-CCA-R3-CD, 2004 WL 34506, at *22 (Tenn. Crim. App. Jan. 7, 2004), *no perm. app. filed*; *Hughes*, 2001 WL 91736, at *14.

### 4.  Tactical Waiver

Next, we must consider whether the Defendant waived the issue for tactical reasons.  *Rimmer*, 623 S.W.3d at 255-56.  The State argues that there were sound strategic reasons for defense counsel to refrain from objecting to an instruction on aggravated assault, as it carries a reduced penalty.  The State's argument is technically true but legally unavailing because the properly charged lesser-included offenses carried even lesser punishments than the improperly charged offenses.  The Defendant was charged with attempted second degree murder, a Class B felony.  Tenn. Code Ann. §§ 39-13-210(c)(1); 39-12-107(a).  As charged in this case, the Defendant was convicted of aggravated assault, a Class C felony.  Tenn. Code Ann. § 39-13-302(d)(1)(A)(i)(*a*).  However, the next properly charged lesser-included offense for attempted second degree murder is attempted voluntary manslaughter, which was a Class D felony at the time of the offense.  Tenn. Code Ann. §§ 39-13-211

---

[3] We note that the jury was also charged to consider assault as a lesser-included offense, which is also not a lesser-included offense of attempted second degree murder.  *See State v. Hughes*, No. W1999-00360-CCA-R3-CD, 2001 WL 91736, at *14 (Tenn. Crim. App. Jan. 26, 2001), *no perm. app. filed.*

- 13 -

(2022) (subsequently amended); 39-12-107(a). Particularly in light of the Defendant's claim of self-defense at trial, this court sees no strategic reason for the Defendant to waive for tactical reasons any objection to the trial court's instructing the jury on an improperly charged lesser-included offense that resulted in his conviction for a higher classification offense than the next properly charged lesser-included offense.

There is nothing in the record before us indicating that the Defendant requested that aggravated assault be charged as a lesser-included offense or had any input in that charging decision. We find that the Defendant has established that he did not waive the issue for tactical reasons.

### 5. Substantial Justice

Finally, we must determine if consideration of the issue is necessary to achieve substantial justice. *Rimmer*, 923 S.W.3d at 256. In this case, the jury convicted the Defendant of an offense for which he did not have proper constitutional notice. He was neither indicted for aggravated assault nor was it a lesser-included offense for that count of the indictment. "[A] conviction upon an unindicted offense is a clear violation of due process of law under both the federal and state constitutions." *Gray*, 2007 WL 4547970, at *12 (citing *De Jonge v. Oregon*, 299 U.S. 353 (1937)). Therefore, we find consideration of the issue necessary to achieve substantial justice.

Based upon the foregoing reasoning, we conclude that it is plain from the record that the trial court committed error in instructing the jury that aggravated assault was a lesser-included offense of attempted second degree murder in Count 1. We further find that the proper remedy is to remand Count 1 to the trial court for a new trial on Count 1. The jury having acquitted the Defendant of the charged offense of attempted second degree murder, the State is precluded under double jeopardy principles from retrying him for that offense. *See Rimmer*, 623 S.W.3d at 254 ("When a jury returns a guilty verdict on a greater offense after it has received [sequential or "acquittal first" instructions], it does not get a full opportunity to consider and return a verdict on the lesser counts. Under those circumstances, if the conviction on the greater offense is later overturned due to a procedural technicality, double jeopardy does not bar retrial on the lesser-included offenses."). However, he may be retried for any lesser-included offense of attempted second degree murder, beginning with attempted voluntary manslaughter. *See Rush*, 50 S.W.3d at 432; *State v. Maupin*, 859 S.W.2d 313, 317 (Tenn. 1993).

### B. SUFFICIENCY OF THE EVIDENCE

The Defendant argues that the evidence was insufficient to sustain his convictions because he acted in self-defense. Having already concluded that the Defendant was

improperly charged with and convicted of aggravated assault, we need not examine the sufficiency of the evidence for that count; accordingly, our review is limited to the sufficiency of the evidence regarding the Defendant's conviction of reckless endangerment. The State argues the evidence was sufficient to sustain the Defendant's conviction and that the jury rationally rejected his theory of self-defense.

Tennessee Rule of Appellate Procedure 13(e) provides that "[f]indings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted) (emphasis in original); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

To establish reckless endangerment with a deadly weapon, as charged in this case, the State must prove beyond a reasonable doubt that the Defendant recklessly engaged in conduct which placed or might have placed another person in imminent danger of death or serious bodily injury and committed said conduct with a deadly weapon. Tenn. Code Ann. § 39-13-103(a), (b)(2). Furthermore, "the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). Here, the evidence adduced at trial showed that the Defendant discharged a firearm multiple times in a parking lot with numerous people in the immediate vicinity. Mr. Tucker was struck multiple times. Several other individuals, including Ms. King, were in close proximity to Mr. Tucker when he was shot, and there were numerous

other individuals in the vicinity of the shooting. This evidence is sufficient to establish each element of reckless endangerment with a deadly weapon.

The Defendant also argues that the evidence adduced at trial was insufficient to prove he did not act in self-defense. A trial court is only required to submit to the jury a claim of self-defense when fairly raised by the proof. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013); Tenn. Code Ann. § 39-11-203(c). Once properly raised, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. Tenn. Code Ann. § 39-11-201(a)(3); *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001) (citing *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. 1996)). Whether a defendant acted in self-defense is a question for the jury to determine. *State v. Story*, 608 S.W.2d 599, 601 (Tenn. Crim. App. 1980) (citing *Henley v. State*, 520 S.W.2d 361 (Tenn. Crim. App. 1975)). "It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn.Crim.App.1997). When reviewing a sufficiency claim under a theory of self-defense, this court will affirm the conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Barnes*, 675 S.W.2d 195, 196 (Tenn. Crim. App. 1984).

The law of self-defense in Tennessee states, in relevant part,

(b)(2) [A] person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;

(B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2).

The jury heard the Defendant's statement to the police that Mr. Tucker attacked him first, and he only hit Mr. Tucker with the gun to defend himself. This proof was sufficient to raise the issue before the jury. Although some witnesses testified consistently with this

version of events, others contradicted it. Mr. Tucker, Ms. King, Mr. Judkins, K.K., and R.K. each testified that the Defendant shot Mr. Tucker before any physical confrontation had occurred and that the two men were separated by distance. Mr. Tucker was unarmed throughout the confrontation. It was within the jury's prerogative to reject the Defendant's claim of self-defense and to credit the testimony of the State's witnesses. Viewing the evidence in the light most favorable to the State, the evidence was sufficient to support the jury's verdict.

## C.  JUDICIAL DIVERSION

Finally, the Defendant argues that the trial court erred in denying his application for judicial diversion. He first contends that the trial court made insufficient findings to support its conclusions and its weighing of the requisite factors in denying diversion. He further claims the record does not support the trial court's conclusions. The State responds that the trial court did not abuse its discretion in denying the Defendant's request for judicial diversion.

In order to qualify for a grant of judicial diversion, a criminal defendant (1) must plead guilty to or be found guilty of a misdemeanor or a Class C, D, or E felony; (2) must not be seeking diversion for certain sexual offenses not relevant here; and (3) must not have a prior conviction for a felony or a Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(B)(i). When a trial court grants a defendant's application for diversion, the defendant's "plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court." *Rodriguez v. State*, 437 S.W.3d 450, 455 (Tenn. 2014) (citing Tenn. Code Ann. § 40-35-313(a)(1)(A)).

Qualification for judicial diversion under the statute does not automatically require the trial court to grant diversion to the defendant. *State v. King*, 432 S.W.3d 316, 327 (Tenn. 2014). Instead, Tennessee Code Annotated section 40-35-313(a)(1)(A) vests the trial court with discretion to grant or deny a qualifying defendant's request for diversion. *Id*. In determining whether to grant or deny diversion, the trial court must consider:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); and then *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court must also weigh each of these factors and place an explanation for its ruling on the record in support of its decision. *King*, 432 S.W.3d at 326. Though the trial court need not recite all the factors on the record, the record nevertheless must indicate that the trial court considered each factor and "identified the specific factors applicable to the case before it." *Id*. at 327.

Judicial diversion is not a sentence; rather, a "grant or denial of judicial diversion is a decision to either defer or impose a sentence." *Id.* at 324-25 (emphasis in original). Given this close relation to sentencing, the appropriate standard of review for a trial court's grant or denial of diversion is for an abuse of discretion as announced in *State v. Bise*. *King*, 432 S.W.3d at 325; *see also State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (holding that sentencing decisions imposed within the appropriate statutory range are reviewed on appeal for an abuse of discretion with a presumption of reasonableness). Further, so long as the trial court considers the *Parker* and *Electroplating* factors, weighs them against each other, and places its findings on the record, we will presume that its decision is reasonable and will "uphold the grant or denial [of diversion] so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 326-27. However, when the trial court fails to consider the *Parker* and *Electroplating* factors or place its findings on the record, we will either review its decision de novo or, if more appropriate under the circumstances, remand the issue to the trial court for reconsideration. *Id*. at 328.

Here, the trial court examined and weighed each of the *Parker* and *Electroplating* factors and placed its findings on the record. Therefore, we apply the presumption of reasonableness to the trial court's decision and will uphold it if there is any substantial evidence to support the denial of diversion. The trial court found that the Defendant's amenability to correction, the circumstances of the offense, and deterrence value to the Defendant and others weighed against granting diversion. The Defendant's criminal history weighed in favor of diversion, and the Defendant's physical history and mental health had little impact. Ultimately, the trial court found that the interests of justice would not be served by granting diversion and denied the request.

The record supports the trial court's findings. It demonstrates that the Defendant admitted that he used illegal substances daily, including the day before he appeared for an interview for his presentence report. He fired multiple shots at an unarmed man in a parking lot, where at least two businesses were open, including the Subway restaurant, which had customers and employees present, including the Defendant's daughter. Several of the people in close proximity to the shooting were minors. Additionally, Ms. King testified that Mr. Tucker had sustained a serious brain injury, suffered persistent diminished motor skills in his left hand, experienced hearing loss in his left ear, received both inpatient

and outpatient treatment for depression, anxiety, and post-traumatic stress disorder, and was unable to work since the crime.  The record thus supports the trial court's denial of diversion.  Therefore, we conclude that the trial court did not abuse its discretion.

### III.    CONCLUSION

Following our review, we reverse and vacate the Defendant's conviction of aggravated assault by causing serious bodily injury and remand for a new trial on the lesser included offense of attempt to commit voluntary manslaughter.  We otherwise affirm the remaining judgment of the trial court.

s/*STEVEN W. SWORD*
STEVEN W. SWORD, JUDGE